*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 21, 2024

Plaintiff-Appellee,

v

No. 362767
Livingston Circuit Court
LC No. 21-026752-FC

JOSEPH HENRY SANTANA,

Defendant-Appellant.

Before: M. J. KELLY, P.J., and BOONSTRA and CAMERON, JJ.

PER CURIAM.

Defendant, Joseph Santana, appeals as of right his jury-trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(c) or (f), and unlawful imprisonment, MCL 750.349b(1)(c). Santana was sentenced to 14 to 30 years' imprisonment for his CSC-I conviction and 3 to 15 years' imprisonment for his unlawful imprisonment conviction. We affirm Santana's convictions, vacate in part the judgment of sentence, and remand for resentencing.

## I. BASIC FACTS

The complainant and Santana started dating in 2017. During the relationship, they engaged in "light bondage" as part of their sexual escapades. They broke up in 2019. Santana attributed the breakup to the complainant's mental-health issues. She, however, testified that the relationship ended because Santana was mentally manipulative. In January 2021, she contacted Santana because she wanted "closure" regarding their relationship. They met in a parking lot and talked in Santana's vehicle. After, Santana drove her to his sister's home without giving her the option of leaving his vehicle. The complainant testified that she then returned with Santana to his apartment, where they had consensual sex. Afterward, she told him she no longer wanted a sexual relationship with him.

Over the next month, they continued to talk. On February 24, 2021, Santana asked the complainant to meet him for drinks. She agreed. Santana then went to a store and purchased a roll of duct tape. Santana and the complainant met at a bar, had some alcoholic drinks, and then returned to Santana's apartment. The complainant testified that Santana initiated intimate contact

while they were watching television in the bedroom. Because she did not want the contact, she stood to leave.

The complainant testified that Santana responded by taking off her shirt and pulling down her pants. She fell face-forward onto the bed and he pressed his knee to her hip in order to hold her in place. He then duct taped her arms and legs, put on a condom, and penetrated her vagina with his penis. She told him to stop and cried. She stated that she eventually told him that, although she wanted to continue, she needed a cigarette first. Santana cut the tape and she left his apartment. Outside, Santana got into her vehicle and tried to stop her from driving away. She insisted that he leave the vehicle and, after he did, she drove away.

The complainant reported the assault to the police and was eventually examined at a local hospital by a sexual assault nurse examiner (SANE). She reported to the nurse that she had been sexually assaulted. The nurse documented that the complainant had various abrasions, bite marks, and bruises on her body, but was unable to do an internal vaginal examination because the complainant was in too much pain.

At trial, defendant described his and the complainant's sex life as "adventurous." He testified that the sexual intercourse, including binding the complainant's arms and legs with duct tape, was consensual. He added that he stopped having intercourse with the complainant when she got tense because he thought she was having a panic attack. The jury, however, found that he was guilty of the crimes as charged.

## II. VOUCHING

### A. STANDARD OF REVIEW

In both the brief filed by his appellate counsel and in his Standard 4 brief, filed under Supreme Court Administrative Order 2004-6, Standard 4, Santana argues that witnesses improperly vouched for the complainant's credibility. Because he did not object to the allegedly-improper vouching at trial, this issue is unpreserved. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). As a result, we review this issue for plain error affecting Santana's substantial rights. See *id*.

### B. ANALYSIS

"A witness may not comment on, or vouch for, the credibility of another witness." *People v Lowrey*, 342 Mich App 99, 109; 993 NW2d 62 (2022). Likewise, it is improper for a witness to "opine about the defendant's guilt or innocence in a criminal case." *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). "Such conduct invades the province of the jury to determine issues in a case." *Lowrey*, 342 Mich App at 109 (quotation marks, citation, and alteration omitted).

Santana first claims that the SANE nurse vouched for the complainant's credibility by referring to the complainant as a "survivor." He identifies the following instances where the nurse used the term "survivor." First, when describing what a SANE nurse is and does, the nurse stated:

> So a sexual assault nurse examiner is a registered nurse who has specialized
> training in sexual assault or forensic nursing. We do a full medical exam for a

survivor of sexual assault, which includes a head-to-toe assessment. We treat any minor medical injuries. We also may refer them to follow-up medical injury—you know, for follow-up medical injuries. We treat minor pain or we also treat for sexual assault diseases such as ST[I]s. And then we also do evidence collection if the patient requests it.

Second, when queried about the paperwork associated with the examination, she testified:

> A lot of times you have to build rapport with your survivors. So if I just started asking what happened, you know, you don't build that relationship, that comfort. So we do—I always do start with their name, kind of small talk, ask medical information. We need to know their medical history, what meds are they on, past medical history, surgeries. So that when we are doing our medical exam, you know, if they've had a hysterectomy, we know that we're not going to find a cervix. Right? So, we need to know what we're looking for and get kind of their background information. And then depending on how the survivor is doing with the questions, we will move into what happened during the assault and then, you know, so that gives me an idea of where do I need to look for injuries. So then from there I will go onto doing a head-to-toe assessment. We start at the head normally unless there is significant injury to the face, we may start somewhere else. So cause the last thing we want to do is put the survivor through more pain by taking photos and touching. So we kind of do move around to make it as comfortable as possible for the survivor.

Next, when asked whether she worked fulltime as a SANE or whether she was on call, she explained that she would "give call hours and then when there is a survivor of sexual assault that needs an exam done" she would come in and complete the examination. Finally, when describing an evidence-collection kit, the nurse stated:

> So the evidence collection kit is a kit that comes from our State Police crime lab. It is a box. Inside that box it has envelopes and then inside the envelopes it has dryer boxes and it has Q-tips that we use. It also has what we call a buccal swab and we swab and get our survivor's, or our patient's own DNA also. It has envelopes for us to collect other samples like hair samples or maybe at times we find condoms or tampons or—so we can collect that kind of stuff. We also, the ten pages that we complete comes in that kit, and then there is a form for consent on how we bill. We never bill a patient but we do either bill their insurance or the State of Michigan.

Santana argues that calling the complainant a "survivor" meant the nurse believed the complainant's story about the sexual assault. He contends the jury likely relied on this vouching when convicting him. However, the nurse did not actually describe the complainant as a survivor. Instead, she only used the term "survivor" when speaking in general terms about her job and job duties. Vouching occurs when one witness opines that another witness is telling the truth or worthy of belief. *Lowrey*, 342 Mich App at 109. Because the nurse did not actually refer to the complainant as a survivor, nor did she opine that the complainant was telling the truth or worthy of belief, we conclude that the nurse did not improperly vouch for the complainant.

In his Standard 4 brief, Santana argues that the trial judge vouched for the complainant by referring to her as a "victim." However, the instances of the judge referring to the complainant as a "victim" occurred when the jury was not present. As a result, the jury could not possibly be swayed by the trial judge's use of the term "victim" when referring to the complainant.

Santana lastly asserts that a police officer improperly referred to the complainant as "the victim." The officer testified that, while searching Santana's apartment, the police "took the duct tape because we were informed that the victim arrived—had duct tape on her." Here, the officer's referral to the complainant as "the victim" is not improper. First, Michigan caselaw does not prohibit witnesses from referring to a complaining witness as a victim during criminal sexual conduct prosecutions. Indeed, MCL 750.520a(s) defines a "victim" as the "person alleging to have been subjected to criminal sexual conduct." Thus, the complainant in this case, who alleged that she was subjected to criminal sexual conduct is, by statutory definition, a victim. Second, the officer did not vouch for the complainant's credibility by calling her a victim. Instead, his comment was made in connection with describing the steps taken during the investigation of her complaint. He did not testify that he believed her allegations were truthful, nor did he testify that he had confirmed the allegations that she had made. As a result, his testimony, which did not comment on or provide an opinion on the credibility of the complainant, is not improper vouching.

Santana also argues that his trial lawyer provided ineffective assistance by failing to object to the alleged vouching by the nurse, the trial judge, and the police officer. However, because no improper vouching occurred, any such objection would have been meritless. A defendant's lawyer is not ineffective for failing to raise a futile objection. *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022).

## III. ABANDONED ISSUES

Santana raises several additional issues in his Standard 4 brief. The prosecution contends that each issue has been abandoned. We agree.

"An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Here, Santana first argues that the prosecution withheld and/or failed to disclose evidence that the complainant had previously made a false accusation that she had been sexually assaulted. Other than that bare accusation, however, he had provided no citation to the record or offers of proof, nor has he directed this Court to any legal authority to support his position. Second, he contends that reversal is required because the prosecution collected evidence from the SANE examination in violation of the complainant's physician-patient privilege. Again, however, he only announces his position and leaves it to this Court to discern the basis for his claim. Third, Santana asserts that the prosecutor committed misconduct by allowing the complainant to perjure herself on the stand without correcting it. As with the prior two arguments, Santana had done little more than announce his position and demand reversal of his convictions. Finally, he argues that his trial lawyer was ineffective for failing to raise the above issues. Yet, he continues to fail to support his position with citation to legal authority, and again does not offer any analysis of the issue. Because each of the above arguments amounts to nothing more than the

announcement of a position without any support analysis, we conclude that each issue has been abandoned on appeal, and we decline to consider them.

## IV. SENTENCING

### A. STANDARD OF REVIEW

Santana lastly argues that resentencing is required because the trial court erroneously scored offense variables (OVs) 3 and 10. "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

### B. ANALYSIS

Santana first challenges the assessment of 10 points for OV 3. "OV 3 designates the number of points to be scored for physical injury to a victim." *People v Johnson*, 342 Mich App 90, 94; 992 NW2d 668 (2022). The court must assess ten points if a "[b]odily injury requiring medical treatment occurred to a victim." MCL 777.33(1)(d). Here the court assessed ten points for OV 3 because the complainant was provided prophylactic medications to protect against sexually transmitted diseases. "[T]he administration of prophylactic medication to prevent pregnancy or disease following a sexual assault is sufficient by itself to require assessment of 10 points for OV 3." *Johnson*, 342 Mich App at 97-98. As a result, the trial court did not err by assessing ten points for OV 3.

Next, Santana argues the trial court erred when it assessed 10 points for OV 10. Under OV 10, a trial court must assess ten points if "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b).

During the sentencing hearing, the prosecution advocated for the assessment of 15 points for OV 10, claiming Santana exhibited predatory conduct before assaulting the complainant. As an alternative argument, the prosecution suggested OV 10 be assessed ten points, stating: "If the court's not inclined to grant [an assessment of 15 points], I would ask for ten points on that in that [Santana] exploited the domestic relationship in order to get her there. So I think that might be the more appropriate scoring." The court stated that it agreed and assessed ten points.

However, in order "to qualify as a 'domestic relationship' " there must be a familial or cohabiting relationship." *People v Jamison*, 292 Mich App 440, 447; 807 NW2d 427 (2011). A mere dating relationship is not sufficient. *Id*. In this case, the complainant and Santana are not family members and did not live together. Accordingly, the court's apparent finding that there was a domestic relationship between Santana and the complainant was clearly erroneous.

Resentencing, however, is unnecessary because the trial court ultimately reached the correct result. Santana was found guilty of CSC-I and unlawful imprisonment. His unlawful imprisonment conviction was based upon evidence that he had physically restrained the complainant to accomplish the CSC. Santana's restraint of the complainant began when he forcibly removed her clothing against her will and pinned her to the bed using his knee. He then used duct tape to hogtie her, thereby immobilizing her arms and legs, while she was pleading with him to stop. In this incapacitated and helpless condition, Santana sexually assaulted the victim on his bed.

The intent of OV 10 is "the assessment of points for the exploitation of vulnerable victims." *People v Cannon*, 481 Mich 152, 157; 749 NW2d 257 (2008). The term "exploit" means "to manipulate a victim for selfish or unethical purposes," MCL 777.40(3)(b), and "vulnerability" means "the readily apparent susceptibility of a victim to injury, *physical restraint*, persuasion, or temptation." MCL 777.40(3)(c) (emphasis added). Santana was found guilty of physically restraining the complainant so that he could sexually assault her. In the complainant's vulnerable condition, Santana exploited her physical disability for the purpose of his own selfish or unethical purposes. Because Santana exploited the victim's physical disability (after creating it), the trial court was required to assess 10 points under OV 10.

"This Court will not reverse when a lower court reaches the right result for the wrong reason." *People v Hawkins*, 340 Mich App 155, 195; 985 NW2d 853 (2022). Although the trial court's analysis under OV 10 was erroneous, its assessment of 10 points was ultimately correct.

Finally, although not raised as an issue upon appeal, we conclude that the trial court erred by ordering Santana to be "subject to lifetime monitoring" under MCL 750.520n. That statute provides that a defendant "shall be sentenced to lifetime electronic monitoring" only when convicted of CSC-I or CSC-II and the crime was "by an individual 17 years old or older against an individual less than 13 years of age . . . ." MCL 750.520n(1). Notably, Santana was not convicted of CSC-I on the basis of his or the victim's ages, MCL 750.520b(1)(a), and the only testimony about their respective ages was that defendant was 27 years old and the victim was 28 years old in 2019, when they broke up. Therefore, by the time the assault occurred in 2021, the complainant was necessarily older than 13 years of age. As a result, the requirement of lifetime monitoring under MCL 750.520n(1) was improperly assessed. Consequently, we vacate in part the judgment of sentence and remand to the trial court.

Affirmed in part, vacated in part, and remanded to the trial court for entry of an amended judgment of sentence consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron