*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LEIGHTON CONRAD PARKS,

Defendant-Appellant.

UNPUBLISHED
December 22, 2025
9:03 AM

No. 371749
Wayne Circuit Court
LC No. 23-004476-01-FH

Before: ACKERMAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his bench-trial convictions of unarmed robbery, MCL 750.530, and receiving and concealing stolen property (RCSP), MCL 750.535(3)(a) (value of more than $1,000 but less than $20,000). The trial court sentenced defendant to concurrent terms of 1 to 15 years' imprisonment for unarmed robbery and one to five years' imprisonment for RCSP. On appeal, defendant argues the verdict was against the great weight of the evidence and that the trial court abused its discretion by determining that the prosecution exercised due diligence in attempting to locate the victim to testify at trial, resulting in the victim's preliminary examination testimony being admitted at trial. And, in defendant's Standard 4 brief,[1] he argues that the prosecution violated *Brady*[2] by editing body-camera footage presented at trial and that his counsel was ineffective for failing to obtain discovery, failing to provide him with discovery, and failing to communicate with him regarding defense strategy. We affirm.

## I. FACTS

Defendant's convictions stem from the robbery of the victim, an elderly, visually-impaired woman, outside a jewelry store at about 11:30 a.m. on Monday, August 7, 2023. Karen Williams, a gold buyer, was working when the victim came in, layered in necklaces, including one with a thick diamond cross. After the victim left the store, Williams heard a scream, saw a bicycle at the

---

[1] Filed under Administrative Order No. 2004-6.

[2] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

storefront, and saw the victim's walking cane in the air. Williams went outside, where she saw a bicyclist heading west on Michigan Avenue. The victim, who was shaking and very upset, told Williams that she had been robbed. Williams noticed that the victim was no longer wearing her cross necklace. Williams "did not see what [had] happened" nor did she see the person riding the bicycle.

At the corner bakery, Ahmad Abusalah heard the victim screaming for help. The victim later told him she had been robbed and he called 911. The victim described the suspect to Abusalah as "a black male dressed in black," who was "riding a bicycle." Abusalah saw a man matching that description heading west on Michigan Avenue.

Dearborn Police Department (DPD) Corporal Richard Townsend responded and spoke with the victim. Corporal Townsend used his police radio to broadcast a description of the suspect and stolen jewelry to others.

A couple hundred yards west of the scene, DPD Corporal Walter Anhut saw defendant, who matched the suspect's description. Corporal Anhut's body-camera footage was admitted as an exhibit and reflected that it was activated at 11:43:36 a.m. Corporal Anhut spoke with defendant, who was very excited and agitated. Corporal Anhut explained to defendant that someone had complained that a person in all black on a bicycle had taken something that did not belong to them. Defendant eventually told the police he was in the area looking for employment at "like a contract house." Corporal Anhut did not believe that there was a contract house in the area. Defendant also described the direction he had come from and said: "I haven't taken anything from anyone." Defendant alleged that the police were harassing him. Defendant insisted that he was not the person who had done this, stating: "I'm not. I'm not. I'm not." Corporal Anhut later asked defendant whether he was carrying any weapons. Defendant responded that he had a knife for his job. When Corporal Anhut reached into defendant's pocket to retrieve the knife, he also found what he believed to be a crack pipe. Defendant was placed under arrest and Corporal Anhut continued to search through defendant's pockets, finding the victim's stolen cross "as described by the responding officer over the radio."

Shortly thereafter, DPD Detective Charles DeBono returned the cross to the victim. Although Detective DeBono could not remember any conversation occurring when he returned the jewelry to the victim, she "accepted it."

At defendant's preliminary examination, the victim testified that when she left the jewelry store, a man on a bicycle asked how she was doing. The victim responded that she was "fine" before she "got a big push in the chest." The man then "yanked" her jewelry from her neck. The victim began screaming and swung her cane at him, breaking it, before she fell. According to the victim, the man was riding east, "going towards Schaefer." Although she could not identify him because "it happened so quick," she described him as a "black male with all black on"[3] and believed that his bicycle's fender was black. The victim reported that two sterling silver necklaces were stolen along with a valuable diamond and rose-gold cross necklace. The police arrived within

---

[3] Corporal Anhut's body-camera footage showed defendant wearing a black do-rag, a black shirt, and blue jeans.

a few minutes, and, later, returned the cross to her; however, the victim maintained that the chain she wore the cross on was not recovered. And, while the police also returned two sterling silver necklaces, they were broken and one of them was missing a star.

When the victim did not appear for trial, the prosecution moved for her preliminary examination testimony to be read into the record due to her unavailability. The trial court found that the prosecution had exercised due diligence to locate the victim and granted the prosecution's motion to admit the victim's preliminary examination testimony as evidence in defendant's trial.

The trial court convicted and sentenced defendant. This appeal followed.

## II. DUE DILIGENCE

On appeal, defendant first argues that the trial court abused its discretion in finding that the prosecution exercised due diligence in attempting to produce the victim at trial. We disagree.

## A. STANDARD OF REVIEW

A trial court's determination regarding the exercise of due diligence is reviewed for a clear abuse of discretion. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Everett*, 318 Mich App 511, 516; 899 NW2d 94 (2017). Whether the admission of evidence violates a defendant's Sixth Amendment right to confront his or her accuser is a question of constitutional law that an appellate court reviews de novo. See *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012). To the extent defendant makes a Confrontation Clause argument, he failed to do so in the trial court, and "[w]hen a party raises a separate argument on appeal than the party raised before the trial court, the party must satisfy the standard for plain-error review." *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when [it] seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks, citation, and alterations omitted).

## B. ANALYSIS

A criminal defendant has a federal and state constitutional right to confront the witnesses against him. See US Const, Am VI; Const 1963, art 1, § 20. See also MCL 763.1 (A criminal accused has the right to "meet the witnesses who are produced against him face to face."). "The purpose of the Confrontation Clause is to provide for a face-to-face confrontation between a defendant and his accusers at trial. This confrontation is an important right of the defendant because it enables the trier of fact to judge the witnesses' demeanors." *Bean*, 457 Mich at 682 (quotation marks, citation, and alterations omitted).

The law is also clear that "[f]ormer testimony is admissible at trial under both MRE 804(b)(1)[4] and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). A witness is considered "unavailable" if she is "absent from the trial or hearing, and (A) the statement's proponent has not been able, by process or other reasonable means, to procure: (i) the declarant's attendance . . . and in a criminal case, the proponent shows due diligence." MRE 804(a)(5)(A)(i) and (B). "The test for whether a witness is 'unavailable' as envisioned by MRE 804(a)(5) is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial." *Bean*, 457 Mich at 684. "The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Id*.

Relying on *Bean* and *People v Phelps*, unpublished per curiam opinion of the Court of Appeals, issued February 1, 2002 (Docket No. 234784),[5] defendant argues the efforts made in this case were insufficient to constitute due diligence. In *Bean*, our Supreme Court found a lack of due diligence where police learned that the witness moved to Washington, D.C., but they made no efforts to locate him there; instead, they continued to return to "the addresses that had already been checked, with the same results—[the witness's] house was boarded up, and [his neighbors] told officers [that] he . . . had moved to Washington[,] D.C." *Bean*, 457 Mich at 685-689.

Defendant argues that, as in *Bean*, the officers in this case merely repeated the steps that had already proven unsuccessful. Defendant, however, ignores that while the officers in *Bean* repeatedly checked a location that they knew the witness no longer lived at, the officers involved here had no indication of the victim's possible whereabouts beyond the address they already had. At the preliminary examination, the officer-in-charge, Detective Zachary Baraboll, confirmed the victim's current address with her, but when he attempted to serve her a subpoena at that address, he discovered he did not have her apartment number and attempted to mail it to the apartment building generally. When Corporal Anhut discovered the victim had left with no forwarding address, Detective Baraboll called local jails, hospitals, and medical examiner's offices, and he checked the Court and Law Enforcement Management Information System (CLEMIS), the Law

---

[4] In pertinent part, MRE 804(b) provides:

The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

(1) *Former Testimony*. Testimony that:

(A) was given as a witness at a trial or hearing whether given during the current proceedings or a different one; and

(B) is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, or cross, or redirect examination.

[5] "While [unpublished] opinions are not binding precedent . . ., [this Court] may consider them as instructive or persuasive." *People v Jamison*, 292 Mich App 440, 445; 807 NW2d 427 (2011).

Enforcement Information Network (LEIN), and the Secretary of State (SOS), for a new address without success. In contrast to the officers in *Bean*, who failed to follow a known lead about the witness's location, when the parties learned of a potential alternate address at trial, Corporal Anhut immediately investigated, discovering that that address was older than the one they already had.

In *Phelps*, this Court noted that despite indications that the witness "would be difficult to find for trial from the very beginning," there was no record showing that the officer-in-charge attempted to obtain her address. *Phelps*, unpub op at 2. There, the officer-in-charge had spoken with the witness 1½ months before the trial, and despite making other efforts to contact her, failed to contact her grandmother until six days before the trial, at which point he learned that the witness was recently discharged from the hospital. *Id*. After contacting the hospital, the officer discovered that the witness provided the defendant's address as her own, and "[d]espite the fact that [the] defendant would benefit if [the witness] could not be found for trial," the officer only spoke with the defendant on the telephone, and "never went to the address." *Id*. The *Phelps* panel determined that those efforts did "not even reach those in *Bean*, *supra*, [that were] found insufficient to meet the requirement of due diligence." *Id*. at 3.

Defendant contends that the efforts made in *Phelps* "appear to have been greater than those in the instant case, yet the Court affirmed the trial court's ruling that due diligence had not been exercised." This argument fails to recognize that determining whether due diligence was exercised is a test of reasonableness dependent on the facts and circumstances of the case. See *Bean*, 457 Mich at 684. See also *People v Eccles*, 260 Mich App 379, 391; 677 NW2d 76 (2004) ("[D]ue diligence is the attempt to do everything reasonable, not everything possible, to obtain the presence of a witness[.]") (Citation omitted).

Further, while defendant asserts that the prosecution's efforts were "too little, too late," he does not suggest what additional actions could have been taken to establish due diligence. Beyond the police efforts already discussed, the prosecutor attempted to contact the victim before every hearing and sent several letters to her last known address. The prosecutor also asked the victim advocate to reach out to the victim, but the victim's telephone number was no longer working. Detective Baraboll began searching for the victim when he learned the case was proceeding to trial, estimating he had been searching for at least a month. He also tried calling the victim on two telephone numbers between 10 and 15 times. Given the efforts of the prosecution and the investigating officers to locate the victim, the trial court did not abuse its discretion in determining due diligence was exercised in this case. See *Bean*, 457 Mich at 685.

To the extent defendant argues his constitutional right to confront the victim was violated, he asserts that "confrontation is important because it enables the fact finder to judge the demeanor of witnesses," and states that the trial court was denied this opportunity. As already explained, however, "[f]ormer testimony is admissible at trial under . . . the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *Garland*, 286 Mich App at 7. In this case, defense counsel cross-examined the victim during the preliminary examination and, because the trial court determined that the prosecution exercised due diligence to produce the unavailable victim, the Confrontation Clause was satisfied. Accordingly, defendant has failed to establish plain error that affected his substantial rights and he is not entitled to relief on this issue. See *Carines*, 460 Mich at 763.

## III. GREAT WEIGHT OF THE EVIDENCE

Defendant next argues the trial court's verdict was against the great weight of the evidence. We disagree.

### A. STANDARD OF REVIEW

This Court reviews a great-weight challenge "by deciding whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Cameron*, 291 Mich App 599, 616-617; 806 NW2d 371 (2011) (quotation marks and citation omitted). "The trial court's factual findings in a bench trial are reviewed for clear error." *People v Anderson*, 341 Mich App 272, 277; 989 NW2d 832 (2022). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

### B. ANALYSIS

A verdict is against the great weight of the evidence "only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial. Absent exceptional circumstances, issues of witness credibility are for the trier of fact." *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008) (citation omitted).

On appeal, defendant acknowledges that sufficient evidence was presented to show that the victim was robbed; nevertheless, he argues that it does not support the inference he was the perpetrator, considering the lack of description of the perpetrator, the conflicting testimony regarding the direction the perpetrator traveled after the robbery, and the questionable credibility of the victim. But "[c]onflicting testimony and questions of witness credibility are generally insufficient for granting a new trial." See *Id*.

Moreover, even without the victim's preliminary examination testimony, the remaining evidence supports the verdict. "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). Indeed, "circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence." *People v Hunter*, 466 Mich 1, 7; 643 NW2d 218 (2002) (quotation marks and citation omitted).

In this case, multiple witnesses testified that the description of the perpetrator was a black male, dressed in black, riding a bicycle. The police responded swiftly and Corporal Townsend broadcast this description over the police radio, along with a description of the stolen jewelry. Within minutes, Corporal Anhut observed defendant, who matched the description, a few hundred yards from where the victim was robbed. Defendant repeatedly denied being involved in taking another's property. Yet, Corporal Anhut found the victim's cross in defendant's jean pocket. Detective DeBono testified when he returned it to the victim, she accepted it. Thus, although no eyewitness evidence was presented identifying defendant as the perpetrator, the trial court did not

clearly err when it found that the circumstantial evidence presented supported such an inference. Defendant fails to show the great weight of the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand, and accordingly, he is not entitled to a new trial.

## IV. *BRADY* VIOLATION

In his Standard 4 brief, defendant argues that the prosecution violated his due-process rights and the rules of discovery by suppressing exculpatory video evidence at trial.[6] We disagree.

### A. STANDARD OF REVIEW

This Court "reviews [constitutional] due process claims, such as allegations of a *Brady* violation, de novo." *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016) (quotation marks and citation omitted). When, however, such a claim is unpreserved, as here, we review for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763.

### B. ANALYSIS

Discovery in a criminal case is governed by MCR 6.201. *People v Phillips*, 468 Mich 583, 589; 663 NW2d 463 (2003). Although a criminal defendant does not have a constitutional right to discovery, "a defendant's right to due process may be violated by the prosecution's failure to produce exculpatory evidence in its possession." *People v Burger*, 331 Mich App 504, 518; 953 NW2d 424 (2020). The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). To establish a *Brady* violation, a defendant must show: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

---

[6] In his statement of the question involved, defendant also mentions MCL 767.94a (material or information within possession or control of defendant or defense counsel; disclosure to the prosecuting attorney), MCR 6.201(A)(6) ("a description of an opportunity to inspect any tangible physical evidence that the party may introduce at trial, including any document, photograph, or other paper, with copies to be provided on request"), MCR 6.201(B)(1) ("any exculpatory information or evidence known to the prosecuting attorney"), and MCR 6.201(B)(3) "any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness at trial"). Other than this, defendant does not discuss or specifically reference either the statute or any court rules in making his argument, and, therefore, we will not address them.

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

Defendant has not established any of the three elements required to show a *Brady* violation. Initially, defendant has not established that the prosecution suppressed the evidence. At the final pretrial conference in January 2024, the prosecution sought a stipulation to admit some of the police body-camera footage. Defendant claimed that he had not reviewed it at that point while counsel stated that he did not believe that defendant had reviewed it. When trial began in May 2024, defense counsel confirmed that he had received a copy of Corporal Anhut's body-camera footage as part of discovery[7] and stated that he had no objection to its admission. Thus, there is no indication the prosecution suppressed any evidence. Nevertheless, defendant alleges that the prosecution suppressed Corporal Anhut's "actual" body-camera footage by "substituting" it with an "edited version . . . comprised of excerpts from different Dearborn Police body cam videos during the search[.]" There is, however, no evidence Corporal Anhut's body-camera footage was edited. At trial, the prosecutor stated that Corporal Anhut's body-camera footage was a nine-minute video. Later still, the court explained that Corporal Anhut's body-camera footage was admitted as an exhibit and that the court had "the ability to see the entire exhibit."

Defendant asserts the "actual" footage is exculpatory because it would disprove Corporal Anhut's "false testimony" and conclusively demonstrate that defendant did not have possession of the stolen cross. But Corporal Anhut identified both defendant and the stolen cross in the body-camera footage presented at trial. Further, this Court was provided with Corporal Anhut's body-camera footage on appeal and the time stamp at which Corporal Anhut identified the cross at trial matches the time in the video that this Court received. Finally, regarding materiality, this evidence was disclosed to defendant and presented at trial. For these reasons, defendant's *Brady* claim fails.[8]

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant, in his Standard 4 brief, raises various ineffective-assistance-of-counsel claims that he contends entitle him to a new trial. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Although this Court denied defendant's motion for remand, seeking an evidentiary hearing in the circuit court, *People v Parks*, unpublished order of the Court of Appeals, entered July 9, 2025 (Docket No. 371749), he preserved these issues for review. But, because no evidentiary hearing was held, we review defendant's ineffective-assistance claims for mistakes apparent on the record. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

---

[7] In September 2023, the trial court signed an order of reciprocal discovery that required the prosecuting attorney to provide defense counsel with "copies of any . . . evidence to be presented in some electronic form, such as audio or video . . . ."

[8] To the extent defendant argues this alleged suppression of evidence "presents a striking case for prosecutorial misconduct," his argument fails for the same reasons.

B. ANALYSIS

The United States and Michigan Constitutions entitle a criminal defendant to assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (quotation marks and citation omitted). "Effective assistance of counsel is strongly presumed, and the defendant bears the heavy burden of proving otherwise." *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021) (quotation marks and citations omitted). "In order to obtain a new trial because of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that [the] outcome would have been different." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023) (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

Defendant argues his trial counsel was ineffective for failing to: (1) investigate and request Detective DeBono's body camera footage; (2) request body camera footage of any officer present when Detective DeBono returned the items to the victim;[9] (3) provide defendant with requested discovery; (4) communicate regarding defense strategy; and (5) cross-examine Corporal Anhut regarding his "false" testimony. In defendant's view, the time stamps from Detective DeBono's or other officers' body cameras should have been compared to Corporal Anhut's body-camera footage as to the timeframe that Corporal Anhut "allegedly found defendant in possession of [the] stolen cross." And, if there was a discrepancy between those time stamps, defense counsel was ineffective for declining to cross-examine Corporal Anhut on that point.

"The defendant has the burden of establishing the factual predicate of his ineffective assistance claim." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). Defendant has not done so. At sentencing, defendant indicated that he never had any discovery and there were some pictures that his prior attorney had shown him that were not presented during trial. The court responded that defendant's discovery was available to him and defense counsel added: "I give it to you on the record." After sentencing, defendant filed a motion for discovery, alleging that he "was never afforded any discoverable materials by either the [prosecutor] or appointed defense [counsel] anytime [sic] before the trial up until the present time." As with his *Brady* claim, the crux of defendant's ineffective-assistance claims is based on the premise that he was denied

---

[9] We note that Corporal Townsend remained on-scene with the victim and the body-camera footage of their 20-minute interaction was admitted as an exhibit. It shows that, at about 11:55 a.m., the police officers, who were with the victim, were informed that her property was recovered and that it was going to be photographed before being returned to her. Corporal Townsend shared this news with the victim, telling her property would be returned to her "in just a minute." This timing is consistent with Corporal Anhut's body-camera footage, which captures him retrieving the victim's jewelry from defendant's pants' pocket at 11:51:51 a.m., and showing it to another officer. Further consistent with this footage are five police photographs, admitted as exhibits during trial, of the items Corporal Anhut removed from defendant's pants' pockets, including the victim's cross.

discovery that would conclusively prove his innocence, namely, the timestamps from the responding officers' body-camera footage to show that Corporal Anhut's body-camera footage was in fact edited. Again, the record below reflects that there was no edited version of Corporal Anhut's body-camera footage and that the version played during trial was provided to the defense along with the other exhibits, including Corporal Townsend's body-camera footage and the photographs of the items Corporal Anhut removed from defendant's pockets.

As for defendant's claims that trial counsel failed to provide discovery and discuss defense strategy with defendant, the record reveals that trial counsel received discovery and provided it to him. Further, "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including overarching defense strategy." *Florida v Nixon*, 543 US 175, 187; 125 S Ct 551; 160 L Ed 2d 565 (2004), quoting *Strickland*, 466 US at 688. "That obligation, however, does not require counsel to obtain the defendant's consent to 'every tactical decision.' " *Id.*, quoting *Taylor v Illinois*, 484 US 400, 417-418; 108 S Ct 646; 98 L Ed 2d 798 (1988). Rather, "an attorney has authority to manage most aspects of the defense without obtaining his client's approval." *Nixon*, 543 US at 187. In this case, the record reflects that defendant's court-appointed counsel discussed the plea offer with defendant, who maintained his innocence and requested a bench trial. Consistent with defendant's assertion of innocence, defense counsel argued that the prosecution presented insufficient evidence establishing that defendant was the perpetrator of the charged crimes. Defendant has not met his dual-burden of establishing that counsel performed deficiently and that he was prejudiced by counsel's alleged failure to discuss defense strategy. As already discussed, the evidence against defendant was compelling. Police body-camera footage depicted law enforcement stopping defendant within 15 minutes, just blocks from the area where the victim had been assaulted, and finding the jewelry which had been yanked from her neck in defendant's pocket. And, with the exception of his blue jeans, defendant matched the witnesses' combined descriptions of the perpetrator—a black man wearing black clothing riding a bicycle with a black fender. Defendant is not entitled to relief on these claims.

Finally, defendant asks this Court to vacate his convictions and remand to the trial court for an evidentiary hearing. He also seeks to compel the trial court to disclose the "edited" body-camera footage along with body-camera footage showing Detective DeBono returning the stolen cross to the victim. A remand for a *Ginther*[10] hearing is appropriate when the "defendant has demonstrated any issue for which further factual development would advance his claim." *People v Chapo*, 283 Mich App 360, 369; 770 NW2d 68 (2009). A defendant demonstrates the need for development of a factual record by presenting affidavits or by making an offer of proof. See MCR 7.211(C)(1). Defendant failed to demonstrate a need to develop a further record because this Court

---

[10] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

and the trial court are already in possession of the unedited video and photographic exhibits from trial and he offers no explanation as to how footage of the victim's jewelry being returned to her would change the outcome of his trial.

Affirmed.

/s/ Matthew S. Ackerman
/s/ Stephen L. Borrello
/s/ Anica Letica